The CAIN PARTNERSHIP, LTD., Plaintiff–Appellant,

v.

PIONEER INVESTMENT SERVICES COMPANY, Defendant–Appellee.

and

First National Bank of Louisville, Intervenor.

Supreme Court of Tennessee, at Knoxville.

Jan. 22, 1996.

Dean B. Farmer, Hodges, Doughty & Carson, Knoxville and Larry E. Parrish, Larry E. Parrish, P.C., Memphis, for Plaintiff–Appellant.

G. Wendell Thomas, Jr., Kennerly, Montgomery & Finley, P.C., Knoxville, for Defendant–Appellee.

Richard B. Gossett, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Chattanooga and R. Thomas Stinnett, Stone & Hinds, P.C., Knoxville, for Intervenor.

### OPINION

REID, Justice.

■ This case presents for review the decision of the trial court granting summary judgment to the defendant/lessee in an unlawful detainer action to recover possession of certain commercial property leased to the defendant by the plaintiff. The award of summary judgment is reversed, and the case is remanded to the trial court.

## I

The facts and circumstances which form the context for the questions of law presented are not disputed. In 1974, the Cain Partnership LTD (Cain), a limited partnership, leased a tract of commercial real property located in Knox County for a term of 20 years and granted the lessee the right to extend the lease for three terms of 20 years each and an additional term of 15 years. In 1987, the lease was assigned to a subsidiary of the defendant, Pioneer Investment Services Co. (Pioneer), and later transferred to Pioneer.

The provisions of the lease relevant to the issues are:

In consideration of the lease aforesaid the Lessee contracts and agrees to pay for the aforesaid premises an annual rental of $18,000.00, payable at the rate of $1,500.00 per month in advance, the first said monthly payment to be due on the 1st day of January, 1975. The rental shall be paid at the office of the general partner of Lessor in Knoxville, Tennessee, promptly when due and without demand either upon the premises or elsewhere.

As further consideration for said lease, and in addition to the monthly payment provided for herein, the Lessee shall pay all real property taxes assessed against said property by taxing authorities during the term of this lease and any renewal thereof. Said taxes shall be paid promptly when due during the entire term.

The lease contains no language regarding defaults in payment or performance, forfeiture, or remedies for breach of the terms of the lease, except for a provision allowing the recovery of attorneys' fees in the event Cain should be required to take legal action to enforce the terms of the lease.

In 1984, in order to facilitate an arrangement between Pioneer and First National Bank of Louisville (the Bank) for a development loan from the Bank to Pioneer to be secured by a deed of trust on the lessee's leasehold interest in the property, Cain executed a "Landlord's Estoppel Certificate" for the benefit of the Bank and Pioneer, whereby

Cain agreed that it would give notice to the Bank of any default by Pioneer in the performance of the lease and would give the Bank 30 days from the date of its receipt of the notice within which to cure the default. In return, the Bank agreed to give Cain notice of any default in Pioneer's obligation to the Bank.

The lease which is the subject of this litigation has been the subject of extensive legal proceedings, including a case decided by the Sixth Circuit Court of Appeals.[1] Though not controlling the determination of the issues in this case, those proceedings provide relevant circumstances and put the issues in focus.

On April 12, 1989, Pioneer filed a voluntary petition in bankruptcy and became a debtor-in-possession. On May 25, 1989, Cain filed a motion to lift the automatic stay so that Cain could repossess the leased property, on the ground that the lease had "automatically" terminated because the lessee had failed to pay the property taxes when due. The bankruptcy court refused to lift the stay, holding that in the absence of a specific forfeiture provision, a non-residential lease does not terminate automatically upon default in payment or performance by the lessee. On appeal, the district judge affirmed the holding by the bankruptcy judge and, in addition, found that because the lease contained no forfeiture or termination provision, no default by the defendant would constitute grounds for termination of the lease. The Sixth Circuit Court of Appeals affirmed the decision of the district court, but limited its approval to the first ground. That court's interpretation of Tennessee law on the subject was stated as follows:

[T]he bankruptcy court and the district court determined that Tennessee law requires affirmative conduct by a lessor in order to terminate a nonresidential lease which lacks a termination or forfeiture clause on the ground of breach. Accordingly, the courts below concluded that the

Colonial Lease, which lacks a termination or forfeiture clause, was not terminated prior to the filing of Pioneer's bankruptcy petition because the Partnership took no action to terminate the lease. We think that the District Court properly interpreted and applied Tennessee law in reaching this conclusion.

*In re Pioneer Inv. Serv. Co.,* 946 F.2d at 450.

On November 12, 1991, subsequent to the termination of the proceedings in federal court, this suit was commenced. The complaint alleges unlawful detainer (Tenn.Code Ann. § 29–18–104 (1980)) and seeks possession of the leased premises, incidental damages, and attorney's fees. The plaintiff contends that the lease automatically terminated upon the defendant's failure to pay the taxes when due, and, in the alternative, that the defendant persisted in its failure to comply with the provisions of the lease for the payment of taxes after the receipt of adequate notice and an opportunity to cure the default.

The Bank, which was allowed to intervene, filed a motion to dismiss the complaint, contending that pursuant to the estoppel certificate, Cain was obligated to give the Bank notice of and an opportunity to cure any default prior to the initiation of any action to have the lease terminated.

The trial court accepted Pioneer's argument that the lease could not be judicially terminated because it contains no provision for termination, declared the issue raised by the Bank moot, and dismissed the complaint.

The Court of Appeals held that the Bank had not been given an opportunity to cure the default before the suit was filed, as required by the estoppel certificate, and affirmed the trial court's dismissal of the suit.[2]

For the purposes of this appeal, the record supports the trial court's finding that the lessee failed to pay the taxes assessed against the property, and that failure was a breach of a material provision of the lease.

---

1. *In Re Pioneer Inv. Serv. Co.* 946 F.2d 445 (6th Cir.1991), *cert. denied,* 504 U.S. 956, 112 S.Ct. 2304, 119 L.Ed.2d 226 (1992).

2. Subsequently, the Bank entered into an agreement to release the liens on the leased property, and notified this Court pursuant to Tenn.

R.App.P. 14 that "all differences with its borrowers ... with respect to any interest which it may have had in the property which is the subject matter of this litigation," had been resolved. Consequently, the Bank is no longer before the Court.

## II

■ The only issue before the Court is the relief available to the lessor. Consequently, the issue presented is a question of law. Questions of law are reviewed *de novo* with no presumption of correctness. *See* Tenn. R.App.P. 13(d); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993).

## III

The principles defining the rights and obligations of the parties to a lease of real property developed as part of the common law and arise from both property and contract law. A short review regarding the evolvement of these principles is helpful in determining the rights and obligations of the parties in this case.

### The Nature of a Lease

A lease for a definite term originally served as a moneylending device, used to avoid the ecclesiastical ban on usury[3], and consequently, a lease was deemed to be a personal and contractual interest. 2 Richard R. Powell, *Real Property* § 16.02[1][a] (1994). Gradually, the lease became used instead, to allow landowners to contract for the farming of their lands by the landless; again "the tenant was by definition 'one who had no right in the land, but merely the benefit of a contract.'" *Id* (quoting 2 F. Pollock & F. Maitland, *History of English Law* 36 (1895)). Between 1200 and 1500, the lessee became recognized as the owner of an interest in land, and the lease as a "conveyance" of an estate in land.

The reasons why this change was made were partly legal and partly economic. We have seen that the machinery of a term of years had ceased for technical legal reasons to be employed in the creation of a mortgage. Therefore the beneficial lease for this purpose went out of use. We have seen that the decay of the labour-service system was the cause of a great extension in the practice of letting the land to lessees for years for longer or shorter terms. It is quite clear that such lessees, if ejected, would not have been compensated adequately if they had only been given damages. We have seen, too, that the government desired to stop the depopulation of the country caused by the conversion of arable land into pasture for sheep. It is obvious that a rule that the ejected lessee could not recover the land would have facilitated the operations of the landlords, who were pursuing this undesirable policy.

3 William Holdsworth *A History of English Law,* 216–17 (5th ed. reprinted 1991).

More recently, the utility of a lease has been its provision of shelter, and the maintenance of habitable conditions for a growing population: "The urbanization of the population resulting from the growth of cities has shifted the focus of the lease transaction from land to shelter, and has produced an inequality of bargaining power between landlord and tenant, factors that have been cited prominently in recent judicial decisions expanding the rights of residential tenants." 2 Richard R. Powell, *Powell on Real Property* at § 16.02[1][a]. The historical background and practical services that a lease provides have culminated into the present status of a lease which has been summarized as follows:

A lease of land creates rights and duties based on two independent grounds. First, the lease represents a conveyance of an estate in real property and a relationship arises between the lessor and lessee based on ownership of the demised premises. The parties are said to be in privity of estate as long as the landlord-tenant relationship exists. Second, the lease agreement creates a contractual relationship between the lessor and lessee. The parties are said to be in privity of contract with the terms of the lease defining their rights and obligations. Typically, the lessee's obligation to pay rent and taxes arises by virtue of both privity of estate and privity of contract. *See* Schoshinski, *American Law of Landlord and Tenant* § 8.1, at 532

---

3. "[T]he money-lending function occurred as follows: The landowner would lease the property to the lender, fixing a term of sufficient duration to allow the lender to recover, from the productivity of the land, both the principal and interest of the loan." 2 Richard R. Powell, *Real Property* § 16.02[1][a], n. 1 (1994); *see also* 1 Milton R. Friedman, *Friedman on Leases* § 1.1, n. 10 (1990).

(1980); *Consumer's Ice Co. v. Bixler*, 84 Md. 437 35 A. 1086 (1896).

*Italian Fisherman v. Middlemas*, 313 Md. 156, 545 A.2d 1, 4 (1988).

## Lease as Conveyance

Under the theory that the lease conveys the property for a term of years, the tenant is the owner of the leased property for the term and, therefore, the landlord need not concern himself with the property, but only with his damages under the lease; thus, the nonpayment of rent or taxes would result, not in an effort to regain possession of the property by forfeiture, but in a suit for payment of the rent, interests and costs.

From the premise that a lease is a conveyance there were some consequences. When a landlord conveyed—executed and delivered a lease to a tenant—he had done all he had to. From then on the tenant was on his own. Landlord need not repair. Nor need he render any services to tenant. If the house burned down it did not matter. The lease continued, as well as tenant's liability for rent and other obligations.

There was also an important consequence to the landlord. By conveying to the tenant for a specified term, landlord parted with all possessory rights until the time specified in the lease for its expiration. Neither nonpayment of rent nor breach of covenant by tenant divested the estate so created or revested landlord with a right to possession. His remedy was to sue for rent or for breach of covenant, but with no right to dispossess. This has been changed generally in this country by statutes that give a landlord possessory remedies for nonpayment of rent, and by statutes and lease provisions that extend possessory remedies to breach of covenant and to other circumstances as well.

1 Milton R. Friedman, *Friedman on Leases*, § 1.1 (1990).

4. Whereas the action for unlawful detainer is a "purely possessive action" where there is no issue of legal title, *Metropolitan Life Ins. Co. v. Moore*, 72 S.W.2d 1050, 1051 (Tenn.1934), and

## Detainer and Re-entry Law

Still, there were actions under which a landlord could recover possession at common law; however, they were apparently unsatisfactory:

Courts of equity treat the landlord's right to forfeiture for breach of such conditions as being, in effect, a mere security for the payment of the obligation. Thus, equitable relief is ordinarily granted upon the payment of the principal sum with interest and costs that have accrued, these payments being regarded as compensation for nonpayment when the obligation was due ... 1 Tiffany, *Real Property* § 215 (3d. ed. 1939).

*Dreisonstok v. Dworman Bldg. Corp.*, 264 Md. 50, 284 A.2d 400, 404 (1971). Consequently, statutory enactments have become significant in this area of the law:

Although actions to recover possession of real property existed at common law the particular action of unlawful detainer resulted from the evolution of the law and did not appear in this State until passage of the first unlawful detainer statute in 1821.

*Newport Hous. Auth. v. Ballard*, 839 S.W.2d 86, 88 (Tenn.1992).

■ The Tennessee statute creates a right to bring a cause of action for a writ of possession when a lessee remains on the leased property after the lease has been terminated. The statute provides:

Unlawful detainer is where the defendant enters by contract, either as tenant or as assignee of a tenant, or as personal representative of a tenant, or as subtenant, or by collusion with a tenant, and, in either case, willfully and without force, holds over the possession from the landlord, or the assignee of the remainder or reversion.

Tenn.Code Ann. § 29–18–104 (1980). The intent of the 1821 legislative act, in creating the action of unlawful detainer, was to provide an action to determine the right of possession of real property. *Newport Hous. Auth. v. Ballard*, 839 S.W.2d at 89.[4]

action for ejectment "is purely a legal action to be brought in circuit or chancery court with the only question being one of legal title and the right to possession in connection with the title."

The statute was intended to prevent bloodshed, violence, and breaches of the peace, too likely to arise from wrongful intrusion into the possession of another, and to give a right to restitution under the statute; it is not so absurd as to require actual bloodshed and violence, and frequent breaches of the peace, in the acquisition or retention of the possession.

*Childress v. Black,* 17 Tenn. 317, 320 (1836). The action in unlawful detainer was for possession of the property (Code, sec. 9257), and the judgment for rent and damages are incidental to the judgment for possession. *Bloch v. Busch,* 160 Tenn. 21, 22 S.W.2d 242; Code, secs. 9244 and 9247. Compare 36 C.J.S., Forcible Entry and Detainer, § 3.

"The action is strictly possessory in its nature, so that ordinarily the immediate right to possession is all that is involved or can be determined."

*Nashville Hous. Auth. v. Kinnard,* 186 Tenn. 33, 207 S.W.2d 1019, 1021 (1948).

### Forfeiture

However, the detainer statute by itself does not address the problem of the tenant who breaches the provisions of the lease which has not by its terms expired. Thus, at common law, the landlord had to specifically provide for forfeiture of the lease upon a breach of the terms in the lease itself. For instance, in *Barnett v. Dooley,* 186 Tenn. 611, 212 S.W.2d 598, 600 (1948), the Court held:

The law is that "a tenant's failure to pay rent does not terminate or forfeit his tenancy, in the absence of a provision in the lease for such forfeiture; and where there is such a provision, the landlord must make formal demand of the rent ... unless such demand is waived by the lease or by act of the parties." *Smith v. Holt,* 29 Tenn.App. 31, 193 S.W.2d 100, 102 (1946).

This harsh result has been changed in many instances by statute:

At common law, if the lease simply imposed a promissory obligation on the tenant and nothing more, a breach of the

*Newport Hous. Auth. v. Ballard,* 839 S.W.2d 86, 89 (Tenn.1992).

obligation gave the landlord an action for breach of contract, but no power to terminate the lease. In order to have the power to terminate at common law, the landlord had to couple the covenant with an express provision for forfeiture of the lease upon breach of the covenant. The common law approach has now been widely changed by statutes which give the landlord, in the absence of a lease forfeiture clause, the power to terminate the lease for at least the most serious kinds of tenant defaults, such as failure to pay rent.

2 Richard R. Powell, *Powell on Real Property* at § 17.02[1][a][i].

It is generally recognized that a strict adherence to viewing the lease as a conveyance in property should yield to contract law in the situation of the tenant who fails to pay rent.

The *Uniform Residential Landlord and Tenant Act* explicitly recognizes the landlord's remedy of termination of the lease in cases of "material noncompliance by the tenant with the rental agreement." Accordingly, under the *Uniform Act,* the landlord's remedy of termination, subject to proper notice to the tenant, is recognized regardless of whether the landlord has specifically reserved the right to terminate in the lease. The *Restatement (Second) of Property* [5] takes substantially the same position, allowing the landlord to terminate the lease for the tenant's failure to perform a promise within a reasonable time after being requested by the landlord to do so where as a result of the failure "the landlord is deprived of a significant inducement to the making of the lease." Upon the tenant's failure to leave voluntarily after failure to correct the breach, the landlord may pursue whatever remedies are provided under local law to recover property from a holdover tenant.

*Id.* at § 17.02[1][a][ii]. *Cf.* Tenn.Code Ann. § 66–28–505 (1993) (providing for termination of a lease governed by the Tennessee Uniform Residential Landlord and Tenant Act—"[i]f rent is unpaid when due and the

**5.** Discussed *infra* at [459].

tenant fails to pay, written notice by the landlord of nonpayment is required" before termination of a residential lease.) However, the Tennessee statute is limited to residential leases and does not by its terms control the rights and liabilities of the parties to a lease of non-residential property.[6]

## IV

Prior decisions of this Court have followed the common law concept that a lease is a conveyance of an interest in real property and the rights of the parties are determined by property law. In *Planters Ins. Co. v. Diggs*, 67 Tenn. 563 (1876), which is relied upon by both parties, the lease provided that should the lessee fail during the term to pay the taxes and other specified charges, then the lease was to terminate and the lessor would have the immediate right of re-entry. The Court held:

> These authorities conclusively settle that the forfeiture is to be enforced at the option of the lessor, and by an affirmative act on his part, that is by re-entry for such purpose, based on failure to perform or breach of the conditions, and do not take effect until this is done.

*Id.* at 568. As previously noted, in *Barnett v. Dooley*, 186 Tenn. 611, 212 S.W.2d 598, 600 (1948), and also in *Smith v. Holt*, 29 Tenn. App. 31, 193 S.W.2d 100 (1946), the Court recognized the common law rule that the failure to pay rent does not terminate the tenancy in the absence of a forfeiture provision in the lease; and that where there is a forfeiture provision, the landlord must make a formal demand for the rent unless such demand is waived by the parties.

■ Historically, the chief distinction between a condition and a covenant in an instrument of conveyance pertains to the remedy available to the grantor; breach of a condition subjects the grantee's estate to forfeiture, breach of a covenant subjects the grantor to an action for damages only. *See Sloan v. Cantrell*, 45 Tenn. 571, 577 (1868).

This common law concept, which is based on the technical characteristics of conditions, covenants, and limitations[7] has been replaced in most jurisdictions by statutes which provide the landlord a summary procedure whereby the tenant may be evicted after a default in the payment of rent, whether or not the lease has a clause terminating the lease on failure to pay rent. Restatement of Property (Second) § 12.1 (1977); 2 Powell on Real Property at § 17.02[1][a][ii]. However, Tennessee has no such statute applicable to non-residential leases.

The positions of the parties in this case demonstrate the failure of these traditional common law rules of property law to accommodate present business conditions. Cain's position is that Pioneer "irrevocably breached" the lease by failing to pay the taxes, thereby allowing Cain to terminate the lease at its will. Cain contends that the commencement of the unlawful detainer suit constituted its election to terminate the lease. Pioneer, on the other hand, contends that a leasehold estate in non-residential property "cannot be terminated" in the absence of a clearly stated condition subsequent, and proof of breach, notice and re-entry. Pioneer contends that Cain's only remedy for Pioneer's failure to pay the taxes (or any other breach or default) was an action, or perhaps successive actions, against Pioneer for damages. The history of this case is ample evidence of the inadequacy of these common law rules of property.

In the case before the Court, the lessee's obligation to pay the taxes is stated in the same language and in the same context as the obligation to pay the rent. The instrument evidences the intention that these obligations, which are "in consideration of the lease," are of equal significance. In analyzing the issues in this case, there is no basis on which to distinguish between a covenant and a condition. The terms of the lease are unambiguous in providing that both rent and taxes were to be paid by the lessee. It is recognized that, "[t]he covenant of a tenant to pay taxes, like a covenant to pay rent,

---

6. *But see Crawford v. Buckner*, 839 S.W.2d 754 (Tenn.1992) (extending by judicial decision the applicability of the Act's prohibition of exculpatory clauses in leases, to all counties in the state).

7. 2 Powell on Real Property at § 17.02[1][a][i].

involves the payment of a sum of money which is ascertained, or readily ascertainable, 2 Pomeroy's Equity Jurisprudence § 454A. (5th Ed.1941)." *Dreisonstok v. Dworman Bldg. Corp.,* 264 Md. 50, 284 A.2d 400, 404 (1971). The consequences of the tenant's failure to pay taxes may be more detrimental to the lessor than the failure to pay rent.

The intention of the parties is not given expression in the technical differences between covenants and conditions. The parties' rights and liabilities should turn on an interpretation of the lease, the conduct of the parties, and rules which are consistent with modern business practice. The timely evolution of the common law requires that this result be accomplished.[8]

■ The provisions of the Restatement of Property (Second), § 13.1 (1977), reflect the principles of mutuality and fairness which should govern the determination and enforcement of the legal rights at issue in this case. Consequently, the resolution of the issues presented will be according to that section, which states:

Nonperformance of Tenant's Promise—Remedies Available

Except to the extent the parties to a lease validly agree otherwise, if the tenant fails to perform a valid promise contained in the lease to do, or to refrain from doing, something on the leased property or elsewhere, and as a consequence thereof, the landlord is deprived of a significant inducement to the making of the lease, if the tenant does not perform his promise within a reasonable period of time after being requested to do so, the landlord may:

(1) terminate the lease and recover damages; or

(2) continue the lease and obtain appropriate equitable and legal relief, including

(a) recovery of damages, and

(b) recovery of the reasonable cost of performing the tenant's promise.

This decision requires that the case be remanded to the trial court for further proceedings. The parties may be allowed to amend their pleadings if necessary to address all of the issues relevant to the resolution of their rights and obligations under the lease.

The costs are assessed against the appellants and appellees equally.

DROWOTA and BIRCH, JJ., and WADE, Special Judge, concur.

O'BRIEN, Special Judge, files separate Opinion Concurring in Results.

O'BRIEN, Special Judge, concurring in results.

I concur in the results reached in the lead opinion, however, I conclude that in this case, involving only a commercial lease, it is not necessary to engage in a discourse on "The Uniform Residential Landlord and Tenant Act," or make reference to a general text on real property law, neither of which resolve the issue at hand. There is adequate precedent under Tennessee law.

This action was brought under the Tennessee detainer statutes, T.C.A. §§ 29–18–101 et seq., seeking possession of the premises from the tenant-appellee, Pioneer Investment Services ("Pioneer"). The complaint alleged that the leased property had been assessed for city and county taxes under several different parcel numbers and gave a history of the non-payment of taxes by the tenant. The original lease was executed in April, 1974, between the plaintiff-appellant, The Cain Partnership, Ltd. and Colonial Enterprises. Pioneer became assignee on the original lease in April, 1987, after other previous assignments.

The lease does not contain any termination clause in the event of the breach of one of its material provisions. The crux of the dispute between the parties is contained in the provisions of the original lease agreement requiring payment of real estate taxes, "promptly when due", and whether, in the absence of a termination clause, the lease can be terminated by the lessor for failure to comply with that condition.

First National Bank of Louisville was permitted to intervene in the trial court, asserting that it held a deed of trust lien on a

---

8. *See Broadwell v. Holmes,* 871 S.W.2d 471, 472–73 (Tenn.1994).

portion of the property; and that by written agreement, the lessor was obligated to give the intervenor notice of and an opportunity to cure any defaults prior to initiation of any action to declare the lease terminated. In the interval since the application for permission to appeal was granted, the National City Bank, successor to First National Bank of Louisville, has apparently relinquished any interest in the subject matter of this litigation and is no longer a party litigant.

The trial court found the phrase "promptly when due" to be ambiguous and held that the payment of real property taxes by the tenant at any time before such taxes became delinquent was sufficient to meet its obligation under the lease. It also found that since the lease did not have a termination provision that would permit the lease to be terminated on default, a default under the lease could not result in a termination of the term of the lease.

Finding that in the past there had been a breach of the lease by the tenant in failing to pay taxes before they became delinquent the trial court set a hearing to submit proof on the issue of entitlement to recover attorney fees provided for under the terms of the lease.

(1) The trial court dismissed the complaint insofar as plaintiff sought to terminate the lease;

(2) A motion to amend seeking to terminate the lease as a result of non-payment of 1992 taxes was denied as failing to state a claim for which relief could be granted.

The Cain Partnership appealed the trial court judgment.

The Court of Appeals ruled solely on the issue raised by the intervenor. It held, "The conditions precedent to maintaining this action were not met by the failure of the lessor to give the intervenor notice of the alleged default and an opportunity to remedy such default prior to instituting this action", saying the trial court should have sustained the motion to dismiss. It affirmed the judgment of the trial court as modified. Due to the action taken by the intervenor, it must be concluded that the judgment of the Court of Appeals is of no further significance in resolving the issue.

The ultimate issue to be determined is whether or not the common law or any controlling statute prohibits the lessor from terminating a commercial lease of real property which does not have a termination clause when a tenant breaches a collateral condition of the lease.

Appellant forcefully argues that this court in *Planters v. Diggs*, 67 Tenn. 563 (1876), followed the English common law ruling that the requirement in a real property lease that the tenant pay real property taxes was a condition the breach of which terminated the lease at the discretion of the landlord and without prior notice.

It is not clear that *Planters v. Diggs* supports appellant's issue to the extent it would have this court rule. The lease involved in Planters contained a forfeiture clause. The court said "Forfeitures are not favored in law, and when a forfeiture is once waived, the court will not assist it, and that leases, to be void on conditions such as we have now before us will only be void at the option of the lessor, which requires some affirmative act on his part, and do not take effect until this is done."

The *Planters* court went on to say "This case is to perform a collateral condition, however, that is to pay the taxes but the principle is substantially the same. In such case we think that the sound rule deducible from the authorities, that if the payment be made before the forfeiture is taken advantage of by re-entry by the landlord for this purpose, in accordance with the provision contained in the lease, the forfeiture is saved. The forfeiture is only enforceable by such affirmative action, the option being with the landlord, and if the tenant pay before the option is exercised and re-entry for this purpose, he has paid while the contract is in existence, the condition terminating it not having been taken advantage of, and he thereby saves himself from the forfeiture."

Appellant also refers to an earlier English case, *Davis v. Merrill and Lane,* dating from the year 1851 which in substance held that where a lessee covenants to pay taxes, no

demand was necessary to constitute a breach, so as to entitle lessor to avail himself of the provision for re-entry. The lease in this case contained a covenant to pay rates and taxes, with a proviso for re-entry for breach of any of the covenants. We think that this proviso could be construed as a termination clause of sorts and the ruling is of very little assistance in the case before us.

Since the older cases are obscure and do not provide any definitive answer to the issue before us we must look to the language contained in the lease at hand in order to give it a construction applicable to modern day analysis of commercial leases generally. There has been much litigation between the parties including an adversary proceeding in the United States Bankruptcy Court, Eastern District of Tennessee, subsequent to a voluntary petition under Chapter 11 of Title 11 of the Bankruptcy Laws, facets of which ultimately were decided by the Sixth Circuit Court of Appeals. It is of some assistance for us to take note of some of the findings and determinations of the Federal Courts in the course of the proceedings involving Pioneer Investment Services application for Chapter 11 relief. It was observed by the Bankruptcy Court in the course of those proceedings that the lease involved in this case had not been automatically terminated prior to bankruptcy as a result of Pioneer's failure to pay taxes assessed against the leasehold estate, because *under Tennessee Law affirmative conduct is required by a lessor to terminate a non-residential lease which lacks a forfeiture clause.*[1] (Emphasis supplied.) The Sixth Circuit in affirming the Bankruptcy Court and the District Court stated, in substance, that the lower courts properly interpreted and applied Tennessee law in their conclusion "that the Colonial Lease, which lacked a termination or forfeiture clause was not terminated prior to the filing of Pioneer's bankruptcy petition because the Cain Partnership had not taken any action to terminate the lease."

The case of *Javins v. First National Realty Corporation,* U.S.App.D.C. 369, 428 F.2d 1071, 1074 (1970) which, while going far beyond the parameters of this case, dealt with a landlord, tenant dispute and contains relevant language:

> Since, in traditional analysis, a lease was the conveyance of an interest in land, courts have usually utilized the special rules governing real property transactions to resolve controversies involving leases. However, as the Supreme Court has noted in another context, "the body of private property law . . . . . ., more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. *Courts have a duty to reappraise old doctrines in the light of the facts and values of contemporary life—particularly old common law doctrines which the courts themselves created and developed. As we have said before, the continued vitality of the common law . . . . . . . . . . . . depends upon its ability to reflect contemporary community values and ethics" . . . . . .* (emphasis supplied).

Ironically, however, the rules governing the construction and interpretation of "predominately contractual" obligations in leases have too often remained rooted in old property law. . . .

"Some courts have realized that certain of the old rules of property law governing leases are inappropriate for today's transactions. In order to reach results more in accord with the legitimate expectations of the parties and the standards of the community, courts have been gradually introducing more modern precepts of contract law in interpreting leases. Proceeding piecemeal has, however, led to confusion where "decisions are frequently conflicting, not because of a healthy disagreement on social policy but because of the lingering impact of rules whose policies are long since dead."

In Tennessee, a lease must be construed most strongly against the lessor and most favorably to the lessee, and especially in regard to the payment of taxes where the

---

1. The bankruptcy proceeding was filed 12 April 1989. The complaint in this case relates that defendant was first put on notice on or about 29 August 1991 and again on 19 September 1991

that it had failed to pay, promptly, when due, certain of the real property taxes and that plaintiff intended to institute suit as a result of that failure.

taxes are required to be paid by the lessee; *but where the wording of the lease is not ambiguous, it must be construed according to the wording thereof.* (emphasis supplied). The court can only construe a lease as written, and cannot make a new contract for the parties. The intention of the parties as ascertained by the language of the instrument controls construction of a lease. 17 Tenn.Juris., *Landlord and Tenant*, § 5, (1993 Rep.Vol.)

Following that precept it is necessary to look to the lease agreement to determine the intention of the parties and the requirement for a termination clause in the agreement in order to allow the lessor to declare the lease void for breach of a material provision of the instrument on the part of the lessee. The lease which is the subject of this litigation states in pertinent part:

> That for and in consideration of the covenants and conditions herein contained, to be kept and performed by the lessee, the lessor does hereby let, grant and lease unto the lessee, ........ the following described premises, to-wit: ........
>
> To have and to hold the aforesaid premises unto the lessee for the term aforesaid, subject to the terms and conditions stated herein.
>
> In consideration of the lease aforesaid, the lessee contracts and agrees to pay for the aforesaid premises an annual rental of $18,000.00, payable at the rate of $1500.00 per month in advance, the first said monthly payment to be due on the 1st day of January, 1975. The rental shall be paid at the office of the general partner of lessor in Knoxville, Tennessee, *promptly when due* and without demand either upon the premises or elsewhere. (emphasis supplied.)
>
> As further consideration for said lease, and in addition to the monthly payment provided herein, the lessee shall pay all real property taxes assessed against said property by taxing authorities during the term

of this lease and renewal thereof. *Said taxes shall be paid promptly when due during the entire term.* (emphasis supplied.)

There certainly is not any ambiguity in the wording of these simple provisions of this lease. The intention of the parties is ascertained from the language of the lease itself, as well as the conduct of the lessee in paying the *rent promptly when due*. There is no evidence in this record that the lessee did not understand and adhere faithfully to the terms of the lease by payment of the rent in accordance with its terms. On the other hand, as noted by the bankruptcy judge in his final memorandum, "Pioneer ..... has antagonized the situation by failing to pay the taxes on its leasehold estate except at its whim".[2] Although the issue is moot because the appellee ultimately allowed the tax payments to become delinquent, the fact that the tax collector and the legislature grant a grace period after the date taxes become due for payment prior to the time they become delinquent does not alter the terms of the contract between the parties.[3] There is no possible way, within reason, that the terms of this contract, or the intention of the parties could be misconstrued based on the language contained in the instrument. It is not a case where a lessor is taking advantage of an unknowing or unlettered lessee. In this case, two corporate entities entered into a contract for the lease of a large tract of very valuable property. There is no evidence of any overreaching or fraud. Where a contract is clear and not ambiguous, the parties intentions are to be determined from the four corners of the contract. See *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn.App.1986). It is inconceivable that in this case the lessee could clearly understand the provision for the payment of rent, *promptly when due*, on the first day of each month, and not understand, with equal clarity, payment of the taxes, *promptly when due*, meant on the date the

---

**2.** Pioneer was assigned the lease on 13 April 1987. Apparently the first default in payment of taxes occurred in 1989. Taxes due on 1 October 1989 (T.C.A. § 67–2–701), became delinquent on 1 March 1990 and were not paid until 23 July 1991.

**3.** T.C.A. § 67–5–1804 provides for a discount for early payment.

taxes were to be paid. This was a condition of the lease vulnerable to termination upon violation of the condition.

The problem confronting the court in making an appropriate analysis in this case is that many of the older cases are primarily involved with land leases as opposed to commercial leases as considered in present day law. Moreover, they intermingle the consequences of a breach of a covenant and a violation of a condition. There is some enlightenment in the more recent opinion in *Matthews v. Crofford* 129 Tenn. 541, 167 S.W. 695, (1914), in which Chief Justice Neil delivered the opinion in a somewhat complicated unlawful detainer suit. The case involved a two year lease on certain real estate in the City of Memphis. The lessee fell behind on the payment of notes executed for the purpose of securing the rent and an unlawful detainer suit was filed by the lessor. The suit came to trial and judgment was rendered in favor of the lessor for possession. The case was appealed, and ultimately reached the Supreme Court. In the far ranging decision, Justice Neil discussed the multiple facets of the case and insofar as is relevant, cited a number of authorities to the effect that the action of unlawful detainer is the legal substitute for personal entry. He observed that the reason underlying these cases is that the statutes on this subject, and on forcible entry and detainer, were designed to preserve peace and good order of society and to prevent the collisions that are so likely to follow invasions of real estate. The Court ruled that the service of process in the unlawful detainer suit operated as a constructive re-entry, and actual re-entry by the landlord was unnecessary.

On the question before us, "does the omission of the termination clause in the lease agreement prevent a termination of the lease for the violation of one of its material conditions", certainly, such a clause would most probably preclude or minimize litigation. The absence of a termination clause, or a forfeiture provision authorizing re-entry is an invitation to disputation. However, review of the cases impels me to say the omission is not always fatal. It is our duty to determine the intent of the parties in this case. The

intent was that the lease could be terminated if there was a default in the terms and conditions stated. Implied contracts are creations of the law arising in the absence of express contracts to do that which the law says ought to be done as a matter of right and justice. They are such as reason and justice dictate, and which, therefore, the law presumes that every man undertakes to perform. Generally an implied contract is one which is inferred from the conduct of the parties; it is not necessarily expressed in words. 7 Tenn.Juris., *Contracts,* § 98. There is no doubt that there was a meeting of the minds in this case between the lessor and the lessee. There is nothing in this record to indicate that the rent, *was not paid promptly when due* in accordance with the terms of the lease. There is nothing in the record to indicate that the taxes were *not paid promptly when due* during the term of the lease *by any predecessor lessee to the appellee in this case.* Pioneer cannot dispute that it stands in its assignor's place so as to assume the burden of its contract. It is charged with notice of the terms of the lease and by accepting possession of the leased premises has subjected itself to all the covenants which run with the land and the conditions of the lease agreement.

In courts of equity the rule is settled that forfeitures are relieved against wherever compensation can be made. That rule is inapplicable under the facts of this case. The defendant in this case has allowed the taxes to become delinquent. The only compensation that could be made would to be pay the taxes, accrued penalties, and incidental expenses prescribed in the lease in the event of default. A lessee cannot ignore a condition to pay taxes contained in a lease agreement and obligate a lessor to either pay the taxes or suffer the consequences of having the leasehold sold to the highest bidder at a tax sale. Such a result would be unconscionable.

The primary rule for interpreting instruments is to ascertain the intention of the parties. In determining the parties intentions, the words and phrases contained in the instrument will be giving the ordinary and usual meaning, unless expressly provided,

where the language contained therein is unambiguous. *Jaffe v. Bolton*, 817 S.W.2d 19, 21 (Tenn.App.1991). The cardinal rule of construction of written instruments is that the intention of the parties as ascertained from the language of the instrument controls. In construing contracts the words expressing the parties intentions should be given their usual, natural and ordinary meaning, and neither party is to be favored in the construction. In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust. This Court cannot make a new contract for the parties but can merely construe the lease as written. See *St. Paul Surplus Lines v. Bishops Gate Insurance*, 725 S.W.2d 948, 951 (Tenn.App.1986). The lease agreement before us unequivocally requires lessee to pay the taxes promptly when due. In accordance with the analysis we have made here, we find that the lessor was entitled to terminate the lease under the terms of the lease agreement, with the reservation that since the lease did not contain a termination clause, termination is not automatic. Under the circumstances, in the absence of a termination clause, the lessee is, at the least entitled to notice of the impending proceedings. Appellant alleged in its complaint in the trial court that on at least two occasions defendant was put on notice that its failure to pay real property taxes, promptly when due, would precipitate suit for result of that failure. The record does not indicate if the trial court considered such notices, or had the opportunity to do so, before rendering judgment. Whether or not these notices constitute affirmative action sufficient to justify re-entry is first a matter for the determination of the trial court. This court made clear in *Matthews v. Crofford, supra,* that the service of process in the unlawful detainer suit operated as a constructive re-entry, and actual re-entry by the landlord is unnecessary. To paraphrase that court, the question is not whether the court will enforce a penalty or forfeiture, but whether it will recognize a contract which the parties have made upon a contingency which they have provided for in terms agreed upon between them. The conduct of the original lessee and prior assignors is relevant on this issue.

I would hold that an implied contract existed between the parties to the lease agreement to pay the real estate taxes on the leasehold property, promptly when due. That the appellee in this case as assignee stands in the assignor's place and assumes the burden of its contract. The assignee is charged with notice of the terms of the lease and by accepting possession of the leased premises subjected itself to all the covenants running with the land and conditions inherent within its terms. I would further hold that the lack of a termination clause in the lease does not inhibit the lessor from terminating the lease in the event of violation of its conditions. That in the absence of a termination clause any such termination is not automatic and the lessee is entitled to a notice of intent. I would hold that filing of the detainer action constituted re-entry and the required notice of intent to terminate the lease.

The appellate costs in this case should be assessed against the defendant-appellee, Pioneer Investment Service Company as the instigator of this litigation.